UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION


STEVEN J. CLEWIS,                    )
                                     )
            Plaintiff,               )
                                     )
        v.                           )      No. 1:08 CV 133 JCH
                                     )                       DDN
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
            Defendant.               )


**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

     This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff Steven J. Clewis for disability insurance
benefits under Title II, and Supplemental Security Income under Title XVI
of the Social Security Act, 42 U.S.C. § 401, et seq.  The action was
assigned to the undersigned United States Magistrate Judge for review and
a recommended disposition under 28 U.S.C. § 636(b).  For the reasons set
forth below, the undersigned recommends that the ALJ's decision be
affirmed.


**I.  BACKGROUND**

     Plaintiff Steven J. Clewis was born on November 3, 1959.  (Tr.40.)
He is 5'8" tall, with a weight that has ranged from 132 pounds to 176
pounds.  (Tr. 250, 448.)  He received a GED, and did not take special
education classes.[1]  (Tr. 206.)  He is divorced, and lives with his mother
and two of his teenage sons.  (Tr. 41, 119, 341.)  He last worked at a
hospital in 2000, disposing of hazardous materials.  (Tr. 132-33.)

     On July 13, 2005, Clewis applied for disability insurance benefits
and supplemental security income, alleging he became disabled on November
15, 2000, due to left ventricular dysfunction, congestive heart failure,

_____

     [1]In his neuropsychological evaluation, Dr. Stephen Jordan, Ph.D.,
noted that Clewis had received special education classes for reading
comprehension.  (Tr. 381.)

ischemia, and depression.[2]  (Tr. 40, 43, 47, 51, 199.)  He received a notice of disapproved claims on September 8, 2005.  (Tr. 35-39.)  After a hearing on January 17, 2007, and a supplemental hearing on August 22, 2007, the ALJ denied benefits on September 27, 2007.  (Tr. 8-17, 408-41, 442-72.)  On June 9, 2008, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 4-6.)

## II.  ADMINISTRATIVE RECORD

From 1991 to 2000, Clewis earned over $12,000 a year.  He did not earn any income from 2001 to 2006.  (Tr. 105-07.)  From 1989 to 1993, Clewis worked in maintenance at a flea market.  From 1993 to 1997, he was custodian at a school.  From 1998 to 2000, he disposed of hazardous materials at a hospital.  As part of the hospital job, he frequently lifted fifty pounds or more.  For six months, he supervised four people. From 2001 to 2005, Clewis described himself as unemployed.  (Tr. 132-39, 201.)

On a medication report, Clewis noted taking Zoloft for depression, Risperdal for sleep, Lopid for cholesterol, Advair for breathing, and Toprol for his heart.[3]  (Tr. 129.)

On February 4, 2000, Clewis went to the emergency room complaining of substantial chest pain.  Clewis was a regular and heavy smoker.  A physical examination showed he was alert, oriented, cooperative, and in

---

[2]Ischemia is local anemia due to a mechanical obstruction (mainly arterial narrowing) of the blood supply.  Stedman's Medical Dictionary, 803 (25th ed., Williams & Wilkins 1990).  Congestive heart failure is a condition in which the heart cannot pump enough blood to the body's other organs.  The "failing" heart keeps working but not as efficiently as it should.  People with heart failure cannot exert themselves because they become short of breath and tired.  American Heart Association, http://www.americanheart.org/  presenter.jhtml?identifier=4585  (last visited January 28, 2010).

[3]Zoloft is used to treat depression.  Risperdal is an anti-psychotic drug used to treat mental and mood disorders like schizophrenia.  Lopid is used to help lower fats and cholesterol in the blood.  Advair is used as a long-term treatment for wheezing and breathing troubles, caused by asthma or lung disease.  Toprol is used to treat chest pain (angina), heart failure, and high blood pressure.  WebMD, http://www.webmd.com/ drugs (last visited January 20, 2010).

no acute distress. His lungs were clear and his abdomen was soft and non-tender. An electrocardiogram (EKG) showed no signs of ischemia and a normal sinus rhythm. The cranial nerves were intact, and there were no focal neurological deficits. Clewis had 5/5 strength throughout. An x-ray of Clewis's chest showed the heart was a normal size, the lungs were clear, and the vascularity was normal. There was no acute process. Osama El Shazly, M.D., diagnosed Clewis with chest pain, but of non-cardiac etiology, and most likely secondary to musculocutaneous or gastrointestinal origin. A cardiac catheterization showed no evidence of coronary artery disease. Clewis was hemodynamically and neurologically stable.[4] On February 7, Dr. El Shazly discharged Clewis in stable condition. (Tr. 213, 227-34.)

On July 17, 2002, a treadmill test revealed exercise tolerance of nine minutes. A physical exam showed Clewis had a regular heart rate and rhythm, without murmurs. An x-ray showed no signs of ischemia. Other tests showed the atrial chambers were of normal size, and there was no pericardial effusion.[5] (Tr. 250-54.)

On July 23, 2003, Clewis went to the Community Counseling Center for a psychiatric evaluation. He did not have any consistent history of psychiatric care. His chief complaint was of "feeling a little depressed." Dr. Keddy had referred Clewis because of auditory hallucinations. In particular, Clewis claimed to occasionally hear his girlfriend's or his grandmother's voice, and to have visions of his girlfriend holding him. During the evaluation, Clewis denied these experiences, simply noting that he believed his girlfriend was with him in the bed, but when he woke up, she was no longer there. Asif Qaisrani, M.D., a staff psychiatrist, noted that these auditory hallucinations and tactile delusions appeared to be part of a hypnagogic and hypnopompic

---

[4]Hemodynamic relates to the physical aspects of blood circulation. Stedman's Medical Dictionary, 697.

[5]Pericardial effusion is excess fluid that accumulates in the pericardium, the membrane enveloping the heart. Stedman's Medical Dictionary, 491, 1163.

psychotic experience, and did not require any psychiatric intervention.[6] Clewis denied any command or commentary type hallucinations, or of having any similar experiences when he was completely awake.  He also denied any paranoia.  (Tr. 339-40.)

During the evaluation, Clewis expressed feelings of sadness, hopelessness, and helplessness, but denied any suicidal ideation or passive death wishes.  There were no complaints about anhedonia or a lack of concentration, but he did complain of excessive worrying.[7]  Clewis never had any inpatient psychiatric care, but had briefly been treated with Remeron in an outpatient setting.[8]  Clewis had a consistent work history until he developed his heart problems, and was facing the stress of not being able to find a job because of his medical history.  At the time, Clewis was actively searching for a job.  (Tr. 340-41.)

A mental status examination showed Clewis was fairly groomed and easily engaged.  He did not show any abnormal involuntary movements.  He was calm and cooperative, and his speech was rich and coherent.  His thought process was goal directed, and he showed no signs of delusions, hallucinations, or suicidal or homicidal ideation.  His affect was stable, appropriate, and euthymic.[9]  His concentration was somewhat impaired, but his insight and judgment appeared fair.  Dr. Qaisrani diagnosed Clewis with major depressive disorder without psychotic features, a history of coronary artery disease, and assigned him a GAF

---

[6]Hypnagogic refers to a transitional state, preceding the onset of sleep.  The term is also applied to various hallucinations that may manifest themselves during this period.  Stedman's Medical Dictionary, 747.  Hypnopompic refers to the occurrence of visions or dreams during the drowsy state following sleep.  Id., 748.

[7]Anhedonia is the absence of pleasure from the performance of acts that would ordinarily be pleasurable.  Stedman's Medical Dictionary, 85.

[8]Remeron is used to treat depression.                    WebMD, http://www.webmd.com/drugs (last visited January 20, 2010).

[9]Euthymia refers to a state of joyfulness, mental peace, and tranquility.  Stedman's Medical Dictionary, 545.

score of 58.[10]  Dr. Qaisrani prescribed Remeron, and scheduled a follow-up session in four-weeks.  (Tr. 341-42.)

On August 14, 2003, George Williams, M.D., saw Clewis, following an episode of congestive heart failure, likely secondary to myocarditis.[11]  Clewis noted that he was remaining active at home, and had been tolerating a change from Lisinopril to Toprol.[12]  He reported being able to do all his normal activity - including building furniture and woodworking.  He had no complaints of dyspnea on exertion.[13]  Dr. Williams diagnosed Clewis with an episode of myocarditis, and an enlarged left ventricle.  He encouraged him to stop smoking.  He recommended that Clewis be limited to mild to moderate lifting (less than twenty pounds), but noted he could walk and perform work with his arms and hands.  Dr. Williams asked Clewis to return in six months.  (Tr. 247-49.)

On August 19, 2003, Clewis went to Community Counseling.  He was still looking for a job, and waiting for a disability ruling.  His sleep was better and his appetite was good.  His mood varied, but he denied any guilt or anhedonia.  He was cooperative and his speech was normal.  He was diagnosed with major depressive disorder with psychosis.  (Tr. 337.)

---

[10]Psychosis is a mental disorder causing gross distortion or disorganization of a person's mental capacity, affective response, and capacity to recognize reality, communicate, and relate to others.  The disorder interferes with the individual's capacity to cope with ordinary demands of everyday life.  Stedman's Medical Dictionary, 1286.

A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function.  A GAF score has two components.  The first component covers symptom severity and the second component covers functioning.  A patient's GAF score represents the worst of the two components.  On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers).  Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

[11]Myocarditis is inflammation of the muscular walls of the heart.  Stedman's Medical Dictionary, 1015.

[12]Lisinopril is used to treat high blood pressure.    WebMD, http://www.webmd.com/drugs (last visited January 20, 2010).

[13]Dyspnea is shortness of breath, usually associated with disease of the heart or lungs.  Stedman's Medical Dictionary, 480.

On December 9, 2003, Clewis went to Community Counseling. He was having financial problems, but denied anhedonia. A mental status examination showed he was casually dressed, with no abnormal involuntary movements. He denied any homicidal or suicidal ideation. (Tr. 331.)

On March 16, 2004, Clewis went to Community Counseling. He was having financial issues, but there was no sign of helplessness or hopelessness. He was easily engaged, cooperative, and had no abnormal involuntary movements. His affect was stable. He was diagnosed with major depressive disorder. (Tr. 328.)

On August 2, 2004, Dr. Williams wrote to Shayne Keddy, D.O., Clewis's new primary care doctor. Dr. Williams noted that Clewis was "continuing to do well," and had no complaints of shortness of breath or palpitations. He was able to cut the grass, and complained only of fatigue. His major complaint continued to be depression, and noted that his medications had recently been changed. He was still smoking a pack a day. A physical examination showed his lungs were clear, and his heart sounds were single, without any audible murmurs or gallops. Dr. Williams recommended Clewis continue taking Toprol, and continue receiving Zoloft and Risperdal from his psychiatrist. Dr. Williams scheduled Clewis to return in a year's time. (Tr. 243-44.)

On October 19, 2004, Clewis went to Community Counseling. His ex-girlfriend was thinking of getting back together. Clewis's son was supporting him. (Tr. 322.)

On December 9, 2004, Clewis saw Belinda Pelikan, RN, MSN, CS, at Community Counseling. He noted everything was fine, and denied any new or increased psychiatric symptoms. He was looking forward to Christmas, but worried about his son, who was planning on joining the Army. His mood was usually "pretty sound." (Tr. 320.)

On February 21, 2005, a medical note indicated that Clewis was sleeping all day on the Seroquel, with chills and a fever.[14] He was to stop taking the Seroquel and return to taking Risperdal. (Tr. 317.)

---

[14]Seroquel is used to treat certain mental or mood conditions, such as bipolar disorder or schizophrenia. WebMD, http://www.webmd.com/drugs (last visited January 20, 2010).

On April 21, 2005, Clewis saw Pelikan at Community Counseling. He was doing better, and had been volunteering at a senior center, doing woodwork, and hunting. His main complaint was that the Risperdal made him sleepy. A mental status examination showed his speech was clear, his affect was pleasant, and that he was well groomed. His thought content was normal and logical, and there was no homicidal or suicidal ideation. His next appointment was in a month. (Tr. 314.)

On May 17, 2005, Clewis saw Victoria Damba, D.O. He had no complaints, but had been experiencing intermittent chest pain, with excessive sweating and shortness of breath. He was smoking two packs a day. He noted his depression was under good control. The chart was signed by someone with a MS degree. (Tr. 303.)

On May 24, 2005, Clewis saw Belinda Pelikan at Community Counseling. He was alert and oriented, and his flow of thought was logical. He had a stable mood, and there was no evidence of harm ideation. She diagnosed him with major depressive disorder with psychosis, and prescribed Risperdal and Zoloft. (Tr. 312.)

On May 26, 2005, Clewis saw R.A. Murphy, D.O., for his chest pain. A myocardial perfusion study showed no ischemia or fixed defects. The test was normal. (Tr. 257-58.)

On June 17, 2005, Clewis saw Dr. Damba, for his one-month follow-up. He complained of being "tired," but denied any chest pain or shortness of breath. He was smoking one pack a day, down from two and a half packs a day. Clewis was cooperative, but his affect was flat. His depression was noted to be controlled with Zoloft. Clewis was given samples of Risperdal, Zoloft, and Toprol. He was to follow up in four months, or as needed. His chart was signed by someone with an MSN degree. (Tr. 299.)

On July 8, 2005, Clewis saw James Kerr, D.O., at the Community Counseling Center. Clewis complained that he could not find a job, and that he just did woodworking around the house. He had started hearing "whispers" all the time, with someone calling his name. Yet, he noted his mood was pretty good and his appetite was normal. He complained of feeling tired all the time. Dr. Kerr diagnosed Clewis with major

depressive disorder with psychosis, assigned him a GAF score of 57, and prescribed Risperdal and Zoloft. (Tr. 310.)

On July 15, 2005, A. Donnelly conducted a face-to-face interview with Clewis. Donnelly found Clewis had no difficulty with understanding, coherency, concentration, or answering. He answered questions well and was well-groomed. He had brought his medical records with him. (Tr. 148-51.)

On July 15, 2005, Clewis completed a disability report. His impairments first bothered him in February 2000, when he suffered a heart attack. Clewis returned to work, and continued working until November 2000, when he "quit [his] job to move close to [his] children in Florida." (Tr. 199-207.)

On July 20, 2005, Clewis completed a function report. In a typical day, Clewis took his medication, worked on his wooden signs for over four hours, and spent about three to four hours laying down and resting. Clewis helped his mother care for a pet. He reported some restless nights, but had no problems with personal care. He spent forty-five minutes to an hour preparing meals, though sometimes he just opened a can. He was able to wash dishes, but needed help mowing the lawn. He went out three or four times a day, and was able to drive a car. He went shopping for his woodworking materials about two to three times a month. Beyond woodworking, Clewis noted drawing, fishing, and hunting. Clewis spent time with others, but did not participate in any social activities (such as attending church or sporting events). He noted spending a lot of time in his room. He was able to walk a block before needing twenty minutes of rest. He finished what he started and followed "instructions to the letter." He might forget spoken instructions. He got along with authority figures and had never been fired for not being able to get along with other people. Finally, he handled stress and changes to a routine fairly well. (Tr. 183-90.)

On September 7, 2005, Joan Singer, Ph.D., completed a psychiatric review technique. She diagnosed him with major depressive disorder, and found he had mild limitations in performing daily activities and maintaining social functioning, and moderate limitations in maintaining

concentration, persistence, and pace. She found he had no episodes of decompensation. (Tr. 152-65.)

That same day, Dr. Singer completed a mental residual functional capacity assessment. Dr. Singer found Clewis had either moderate limitations or no significant limitations with respect to understanding and memory, and the ability to maintain concentration and persistence. She found he had no significant limitations with respect to social interaction or the ability to adapt. In her assessment, Dr. Singer found Clewis had symptoms of major depressive disorder, but not before June 2003. She also found Clewis to be quite functional, with evidence that he was able to care for pets and his two older sons, and evidence that he was able to cook, clean, drive, shop, handle his finances, and participate in hobbies. Dr. Singer noted that Clewis was able to complete the forms in a timely manner. As a result, she found Clewis only partially credible. (Tr. 166-69.)

On September 7, 2005, M. Perkins, a medical consultant, completed a physical residual functional capacity assessment. Perkins found Clewis could occasionally lift twenty pounds and frequently lift ten pounds, could stand and/or walk for six hours in an eight-hour day, and could sit for six hours in an eight-hour day. Perkins based his opinions on Clewis's medical records. In particular, Perkins noted that Clewis had shown good exercise tolerance, adequate blood pressure, and no anginal symptomology during a recent medical exam. Perkins also noted that Clewis performed several daily living activities. (Tr. 170-77.)

On September 9, 2005, Clewis saw Dr. Kerr at Community Counseling. His girlfriend had been calling, wanting to come back home. His leg had been "clogging up" and his mood was "so-so." He had not had any hallucinations recently. Dr. Kerr assigned him a GAF score of 58. (Tr. 375.)

On September 30, 2005, Clewis completed a disability report appeal. He had seen a cardiologist, who had said his lungs were not completely well. Clewis also complained of leg pain and shortness of breath. He noted taking Risperdal for sleep, Lopid for cholesterol, Zoloft for depression, and Toprol for his heart. He was not taking as much personal

interest in his activities as before.  He was trying to quit smoking.
(Tr. 191-98.)

On December 5, 2005, Dr. Kerr completed a medical statement
concerning schizophrenia for Clewis's disability claim.  Dr. Kerr noted
that Clewis experienced hallucinations and emotional withdrawal, and had
moderate restrictions of his daily living activities and marked
difficulty in maintaining social functioning.  He also found Clewis had
deficiencies in concentration, and repeated episodes of deterioration or
decompensation.  Dr. Kerr diagnosed Clewis with major depressive disorder
with psychotic features, and assigned him a GAF score of 48.[15]  (Tr. 358-
60.)

On December 8, 2005, Dr. Kerr completed a medical statement
concerning depression with anxiety for Clewis's disability claim.  Dr.
Kerr noted that Clewis exhibited anhedonia, appetite disturbance, sleep
disturbance, psychometer agitation, decreased energy, difficulty
concentrating, hallucinations, generalized persistent anxiety, and
apprehensive expectation.  He found Clewis had marked restrictions of his
daily living activities and marked difficulty in maintaining social
functioning.  (Tr. 355-57.)

On December 8, 2005, Clewis saw Dr. Kerr at Community Counseling.
He had stopped smoking for five weeks, but then started again.  Clewis
had walked to the clinic (about three or four blocks) in the snow.  His
mood was average, and he was still hearing voices and seeing things.
Clewis was sleeping a lot.  He only left the house to drive his mother
to work, and then to pick her up.  Dr. Kerr assigned Clewis a GAF score
of 47.  (Tr. 371.)

On January 6, 2006, Clewis saw Dr. Kerr at Community Counseling.
He had insomnia and felt depressed all the time.  He denied any suicidal
thoughts, and noted having fewer hallucinations.  Dr. Kerr assigned
Clewis a GAF score of 45.  (Tr. 369.)

---

[15]On the GAF scale, a score from 41 to 50 represents serious symptoms
(such as thoughts of suicide, severe obsessional rituals, frequent
shoplifting), or any serious impairment in social, occupational, or
school functioning (such as the inability to make friends or keep a job).
Diagnostic and Statistical Manual of Mental Disorders, 32-34.

On January 9, 2006, Clewis went to Community Counseling. He was living with his girlfriend, and they were getting along. His mood and appetite were good. A mental examination was normal in every respect, and his mood was euthymic. His medication and diagnosis remained unchanged, and he was assigned a GAF score of 63.[16] (Tr. 400.)

On February 3, 2006, Clewis saw Dr. Kerr at Community Counseling. He was getting along with his mother, and denied any recent auditory hallucinations. He was alert, cooperative, logical, and oriented. Dr. Kerr diagnosed Clewis with major depressive disorder with psychotic features, and assigned him a GAF score of 49. (Tr. 368.)

On April 4, 2006, Clewis saw Dr. Kerr at Community Counseling. He was anxious about his girlfriend moving back in. Otherwise, he was alert, oriented, and cooperative, and showed no signs of being psychotic or suicidal. He was cognitively intact and clean, though a bit unkempt. Dr. Kerr assigned him a GAF score of 58. (Tr. 365.)

On August 3, 2006, Clewis saw Dr. Kerr at Community Counseling. Clewis was feeling and sleeping better since his girlfriend had moved back in. They were living with Clewis's mother until they could afford a place of their own. Clewis had a good appetite and did much of the cooking. He denied any hallucinations or suicidal thoughts. He was alert, oriented, logical, and coherent. Dr. Kerr prescribed the same medications and assigned him a GAF score of 60. (Tr. 361.)

On April 18, 2007, Stephen Jordan, Ph.D., completed a neuropsychological evaluation of Clewis, following a referral by the office of disability determinations. Dr. Jordan found Clewis had average intellectual functioning, and high average memory functioning, but impaired concentration. Dr. Jordan noted a clear disconnect between Clewis's reports of depression and anxiety, and his defensive presentation on the personality assessment inventory (PAI). In Dr. Jordan's opinion, this was a "reflection of his lack of insight into his

---

[16]On the GAF scale, a score from 61 to 70 represents mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy, or theft within the household), but the individual generally functions pretty well and has some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders, 32-34.

condition.  The poorly formed nature of his emotional distress would be consistent not only with mood and anxiety disorders, but also personality disorder." (Tr. 379-80.)

Dr. Jordan found Clewis exhibited a marked impairment in his ability to maintain attention and concentration for extended periods.  He also found a marked limitation in his ability to complete a normal workday without being interrupted by his psychologically-based symptoms.  Dr. Jordan noted that Clewis initially suffered from physical limitations, stemming from his heart attack, but that more recently, his depression and anxiety prevented him from engaging in basic self-care and household chores.  Dr. Jordan diagnosed Clewis with major depression, panic disorder with agoraphobia, and generalized anxiety, and assigned him a GAF score of 35.[17] (Tr. 380-81.)

In the history, Dr. Jordan noted that Clewis started hearing voices, and seeing dead relatives and "shadow people," around 2003.  Clewis needed to be reminded to shower, shave, and eat, and would only shower if someone was in the house with him.  He had no difficulty doing chores, driving on his own, and managing his own money.  He felt paranoid in crowds.  His medications included Metoprolol, Advair, Tricor, Risperdal, Zoloft, and Xopenex.[18]  He had never been hospitalized for psychiatric treatment.  Clewis denied any anger issues, but reported becoming anxious, depressed, and agoraphobic after his heart attack.  Before the heart attack, he had been outgoing. (Tr. 381-82.)

---

[17]Agoraphobia is an irrational fear of leaving the familiar setting of home, so pervasive that a large number of external life situations are entered into reluctantly or are avoided.  Stedman's Medical Dictionary, 37.

On the GAF scale, a score from 31 to 40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work).  A score of 35 represents worse than serious symptoms.  Diagnostic and Statistical Manual of Mental Disorders, 32-34.

[18]Metoprolol is used to treat chest pain, heart failure, and high blood pressure.  Tricor is used to help control levels of blood fats.  Xopenex is used to treat wheezing and shortness of breath that commonly occur with lung problems.  WebMD, http://www.webmd.com/drugs (last visited January 20, 2010).

A mental status examination showed Clewis had logical speech and thought.  He was pleasant and cooperative, but complained of visual and auditory hallucinations, and of being depressed.  He was alert and oriented, and exhibited age appropriate intellectual functioning.  His full scale IQ was 88, or in the low average range.  Dr. Jordan believed that Clewis had greater impairments than he was showing.  In his opinion, Clewis tried to "portray himself as being exceptionally free of common shortcomings to which most individuals will admit."  As a result, Dr. Jordan believed the test results were unlikely to be a valid reflection of Clewis's true experience.  (Tr. 382-96.)

On April 26, 2007, Dr. Jordan completed a medical source statement. He found Clewis had a marked limitation in his ability to carry out complex instructions and a marked limitation in his ability to interact with others.  (Tr. 397-99.)

**Testimony at the Hearing**

The ALJ held a hearing on January 17, 2007.  Clewis saw Dr. Damler and Dr. Williams for his heart condition, and saw Dr. Kerr at Community Counseling.  Dr. Kerr had prescribed Zoloft and Risperdal, and Clewis was still taking these.  The Zoloft helped his depression, and the Risperdal helped him sleep and helped with the voices.  His psychiatric medication had remained unchanged since he first started seeing a psychiatrist in 2003.  He saw his psychiatrist at Community Counseling every three months.  He had never been hospitalized because of his mental condition. (Tr. 408-16.)

Clewis heard voices and breathing sounds all the time, on a daily basis.  When the effect of his pills started to wear off, he knew it was time to take another one because he would start to hear things.  Clewis's heart condition produced fatigue, and he would rest two or three times a day, for about an hour or two at a time.  On an average day, Clewis cleaned the house, cooked dinner, and washed the dishes.  Being out in public and around people made Clewis nervous.  (Tr. 416-18.)

Clewis heard his deceased grandparents' voices about two or three times a week, usually at night.  If he was under stress, he was more likely to hear the voices.  The voices woke him up at night, and would

wake him up every hour, every night. The voices did not give him commands. Clewis had not talked to his psychiatrist about the possibility of working. (Tr. 418-27.)

Clewis's cardiologist had told him to avoid lifting more than twenty pounds, and to avoid extreme temperatures and stressful situations. Clewis was able to lift an eight-pound vacuum cleaner without any problems. He could cut the grass for about fifteen minutes, before needing to rest. He believed he could drive for a few hours at a time. His medication produced fatigue/drowsiness and upset stomach, and had been doing so for the last five years. Clewis had "been to a lot of places trying to get work," but had been unable because of the conditions his cardiologist had imposed. Clewis believed he could still work the job at the hospital, disposing of biohazardous materials, if he had sufficient rest periods. (Tr. 418-28.)

Morris Alex, M.D., testified at the hearing. After noting that a series of tests were all normal, Dr. Alex found that Clewis did not satisfy listing 4.02 or listing 4.04, for his heart conditions. However, Dr. Alex believed Clewis met listing 12.04, for effective disorders, at least on December 8, 2005, when his GAF score was low, but as early as July 8, 2005, when he was assigned a GAF score of 48. Dr. Alex believed Clewis could perform light physical exertion. Dr. Alex believed Clewis's hypnagogic episodes were common, and did not consider them psychotic. (Tr. 428-34.)

Jeffrey Magrowski, Ph.D., testified as a vocational expert (VE) during the hearing. In the first hypothetical, the ALJ had the VE accept all of Clewis's testimony as accurate. Under the circumstances, the VE testified that Clewis could not perform any work. In the second hypothetical, the ALJ had the VE assume that Clewis could lift twenty pounds occasionally and ten pounds frequently, and could sit, stand, and walk each for about six hours in an eight-hour workday, but needed to avoid extreme temperatures. The ALJ had the VE further assume that Clewis had moderate limitations in his ability to understand and carry out detailed instructions, maintain attention and concentration, work with others, complete a normal workday without psychologically-based symptoms, and perform at a consistent pace. Under these circumstances,

the VE testified that Clewis could not return to his past work, but could perform short-term work. In the third hypothetical, the ALJ had the VE assume that Clewis could perform simple, routine, and repetitive tasks on a sustained basis, but that he needed to avoid interacting with co-workers or the general public. Under these circumstances, the VE testified that Clewis could perform work as a cleaner or housekeeper, and could work a simple packing job, a light stocking job, or a small assembly job. Each of these jobs was considered light. (Tr. 435-38.)

Dr. Alex did not think a one-time psychiatric evaluation would be helpful. He believed that improvement could only be seen by reviewing the records over a sustained period, from a treating source. Clewis's next psychiatric appointment was set for February 7, 2007. (Tr. 438-41.)

The ALJ held a supplemental hearing on August 22, 2007. There was no report of a February 2007 psychiatric visit, but the ALJ added Dr. Jordan's neuropsychological evaluation to the record. Since the last hearing, Clewis had developed an ulcer in his esophagus. The doctors were treating the ulcer with Tricor. Clewis had also experienced an attack of chest pain and fallen down, but did not seek medical help. He did not have any nitroglycerin tablets at home.[19] His most recent EKG was normal. His cardiologist had not placed any new restrictions on him - he was still restricted to lifting no more than twenty pounds, and needed to avoid extreme temperatures. (Tr. 442-49.)

Clewis was hearing more voices. The voices were muffled, but were of a man and a woman, and he heard them mostly while he was trying to go to sleep, but sometimes during the day as well. The voices did not issue any commands, and Clewis felt guilty for hearing them. Clewis could handle small groups of people, but if there were more than five people around him, it felt claustrophobic, and he needed to leave. (Tr. 449-52.)

Clewis was not working. He was still looking for work, and had applications pending, but most of the people had turned him down. Clewis sent in his last application about a year ago. Since Clewis had always

---

[19]Nitroglycerin is used to treat chest pain due to angina or heart attack. WebMD, http://www.webmd.com/drugs (last visited January 20, 2010).

been involved in labor or construction, he did not know if there was a job out there for him. Finally, Clewis noted that he was no longer seeing Dr. Kerr. Instead, he was seeing Linda, a nurse practitioner, once every two months for his mental conditions. (Tr. 452-53, 470-72.)

James D. Reid, a clinical psychologist, testified at the hearing. Dr. Reid discounted the report of Dr. Jordan. According to the most recent records from Community Counseling, Clewis had a good mood and appetite, and was denying hallucinations. Dr. Reid found it surprising that the pathology described by Dr. Jordan was unknown to his treating psychiatrist at Community Counseling. Dr. Reid also found no evidence that his treating psychiatrist was aware of Clewis's social anxiety, and there was diagnosis of an avoidant personality disorder. As a result, Dr. Reid found Clewis did not meet the listing requirements of 12.04, 12.06, or 12.08. Dr. Reid concluded that Clewis had no limitations in his daily living activities, mild limitations in interacting with others, and mild limitations in concentration, persistence, and pace. He did not believe Clewis had any marked restrictions. He did not believe Clewis had any limitations that would prevent him from performing simple, repetitive, and routine work, and which did not require social interaction. (Tr. 453-59.)

From 2003 to 2005, when his GAF scores were much lower, Clewis may have been unable to work. Dr. Reid discounted Dr. Jordan's report because the levels of pathology Dr. Jordan described in his report were not consistent with the record. He also found Dr. Jordan had not provided sufficient symptoms to support his conclusions and diagnoses. Dr. Jordan's assigned GAF of 35 was far more impaired than the diagnosis of Clewis's treating psychiatrist. (Tr. 459-70.)

### III.  DECISION OF THE ALJ

The ALJ found that the period for disability ran from October 19, 2001, to December 31, 2005. Clewis had filed for disability in the past, and this earlier application had been denied on October 18, 2001. (Tr. 11-12.)

The ALJ followed the five-step procedure. At Step One, the ALJ determined that Clewis had not engaged in substantial gainful activity

since October 19, 2001.  At Step Two, the ALJ found Clewis suffered from a history of left ventricular dysfunction and major depressive disorder with psychosis, and that these impairments were severe.  However, the ALJ dismissed the allegation of congestive heart failure as unsupported by the medical record.  At Step Three, the ALJ found that these impairments did not satisfy a listed impairment.  The testimony of Dr. Alex established that Clewis had not met the listing for ischemic heart disease, listing 4.04, and the testimony of Dr. Reid established that he had not met the listing for affective disorders, listing 12.04.  (Tr. 12.)

At Step Four, the ALJ reviewed Clewis's subjective allegations, and the medical reports of various doctors and professionals.  The ALJ found the report of Dr. Alex persuasive, and concluded that Clewis's heart impairment created only a mild limitation on his activity.  The ALJ discussed the mental health records from Dr. Qaisrani, Dr. Singer, and Dr. Kerr, though he discounted the conclusions of Dr. Kerr as internally inconsistent.  The ALJ gave almost no weight to the consultative examination by Dr. Jordan, finding Dr. Jordan's conclusions unsupported by Clewis's medical history.  Finally, the ALJ found Clewis to be not entirely credible, noting that Clewis was able to perform chores, volunteer at a senior center, and smoke.  The ALJ also noted that Clewis had quit working for reasons unrelated to his impairments, and that he had been looking for work until 2005.  Taken together, the ALJ found Clewis retained the residual functional capacity (RFC) to lift or carry twenty pounds occasionally and ten pounds frequently, sit for six hours in an eight-hour day, and stand and/or walk a total of six hours in an eight-hour day.  Clewis could perform simple, repetitive tasks on a sustained basis, but needed to avoid interaction with co-workers or the general public.  At Step Four, the ALJ concluded that Clewis was unable to perform his past work.  (Tr. 12-15.)

At Step Five, the ALJ cited the testimony of the VE, and concluded that Clewis retained the RFC to perform jobs in the national economy – either as a cleaner, packer, stocker, or small products assembler. Accordingly, the ALJ found Clewis was not disabled within the meaning of the Social Security Act.  (Tr. 15-17.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  <u>Id.</u>  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  <u>Id.</u>  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. <u>See</u> <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); <u>Pate-Fires</u>, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987) (describing the five-step process); <u>Pate-Fires</u>, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  <u>Pate-Fires</u>, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  <u>Id.</u>  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work.  <u>Id.</u>  The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work.  <u>Id.</u>  If the Commissioner determines the claimant cannot return to past relevant work,

the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that Clewis could not perform his past work, but that he was able to perform other jobs in the national economy.

## V. DISCUSSION

Clewis argues the ALJ's decision is not supported by substantial evidence. In particular, he argues that the ALJ's third hypothetical failed to correspond to his actual abilities. He argues that he is unable to perform simple, routine, and repetitive tasks due to shortness of breath and his fluttering heart, and that he has difficulty understanding detailed instructions and maintaining attention and concentration. (Doc. 20.)

### Residual Functional Capacity

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of his limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Id. Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record. Casey, 503 F.3d at 697; Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir.2001).

Evaluating mental impairments is often more complicated than evaluating physical impairments. Obermeier v. Astrue, Civil No. 07-3057, 2008 WL 4831712, at *3 (W.D. Ark. Nov. 3, 2008). With physical impairments, evidence of symptom-free periods offers strong evidence against a physical disability. Id. The same is not true for mental impairments. Id. With mental impairments, evidence of symptom-free periods does not mean a mental disorder has ceased. Id. Mental illness

can be extremely difficult to predict, and periods of remission are usually of an uncertain duration, marked with the ever-pending threat of relapse. <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001).

Adding to these difficulties, individuals with chronic psychotic disorders often structure their lives in a way to minimize stress and reduce their signs and symptoms. <u>Id.</u> Given the sometimes competitive and stressful conditions in which people work, individuals with mental impairments "may be much more impaired for work than their signs and symptoms would indicate." <u>Id.</u>; <u>Obermeier</u>, 2008 WL 4831712, at *3. Worse yet, efforts to combat mental illness present their own unique difficulties. <u>See</u> <u>Pate-Fires</u>, 564 F.3d at 945. Individuals with mental illness often refuse to take their psychiatric medication – a symptom of the illness itself, rather than an example of willful noncompliance. <u>Id.</u>

In this case, the ALJ found Clewis not completely credible, and concluded he retained the ability to perform simple, repetitive tasks on a sustained basis, but needed to avoid interaction with co-workers or the general public. (Tr. 16.) Substantial medical evidence supports this finding.

Looking to the administrative record, Clewis had the physical ability to perform simple, repetitive tasks on a sustained basis. Testing showed Clewis had a regular heart rate and rhythm, without murmurs. (Tr. 250-54.) Other tests showed he had no ischemia or pericardial effusion. (Tr. 257.) Clewis told his doctors that he was able to build furniture and do woodworking. (Tr. 247-49.) He also told them he was able to cut the grass, with fatigue, but no shortness of breath. (Tr. 243-44.) He volunteered at a senior center, went fishing, and hunted turkey. (Tr. 314, 187.) He washed dishes, left the house several times a day, drove by himself, and bought woodworking materials every few weeks. He did not have any problems with personal care. (Tr. 183-90); <u>see</u> <u>Roberson v. Astrue</u>, 481 F.3d 1020, 1025 (8th Cir. 2007) (caring for a child, driving, fixing simple meals, doing housework, and shopping for groceries did not support claimant's alleged inability to work).

Looking to the administrative record, Clewis also had the mental ability to perform simple, repetitive tasks on a sustained basis,

provided he avoided interaction with co-workers or the general public. During his first visit to the Counseling Center in July 2003, Clewis denied any paranoia, and denied that he was having the type of auditory and visual hallucinations that had formed the basis for his referral to Dr. Qaisrani. A mental evaluation showed no signs of delusions or hallucinations. In fact, Clewis told Dr. Qaisrani that he was actively searching for a job. Dr. Qaisrani assigned him a GAF score that indicated moderate symptoms only. (Tr. 339-42.)

Clewis noted that he had quit his job to be closer to his family - and not because of his impairments. (Tr. 200.) On several other occasions, Clewis noted that he was looking for a job, or complained he was unable to find a job. (Tr. 337, 310, 425, 452-53); see Lindsay v. Astrue, No. 08 CV 892 GAF, 2009 WL 2382337, at *3 (W.D. Mo. July 30, 2009) ("Plaintiff reported looking for work and contacting temporary agencies. These statements are inconsistent with disability and indicate that Plaintiff did not view his pain as disabling."). He had clear speech, a pleasant affect, and normal thought content. He never expressed any homicidal or suicidal ideation. (Tr. 314, 369, 365, 361.) He finished what he started, followed instructions to the letter, and got along with authority figures. (Tr. 188-89.) Dr. Singer found he had no episodes of decompensation, and that he was able to complete forms in a timely manner. (Tr. 162, 168); see Rose v. Apfel, 181 F.3d 943, 945 (8th Cir. 1999) (finding claimant was not disabled because, among other reasons, she had not had any episodes of decompensation).

Clewis got along with his girlfriend when she moved back, and noted fewer hallucinations. (Tr. 369, 400.) His GAF scores from Community Counseling ranged from 45 (serious symptoms) to 63 (mild symptoms). (Tr. 369, 400.) During his two most-recent visits to Community Counseling, he showed no signs of being psychotic, denied any hallucinations, and had GAF scores indicating moderate symptoms. (Tr. 365, 361); see Norris v. Astrue, No. 4:08 CV 352-BD, 2009 WL 1505321, at *6 (E.D. Ark. May 28, 2009) ("[A]n ALJ may afford greater weight to medical evidence and testimony than to a GAF score when the evidence requires it."). Clewis saw his psychiatrist every three months, and had never been hospitalized because of his mental condition. (Tr. 415); see Rose, 181 F.3d at 945

(finding claimant was not disabled because, among other reasons, she had never been hospitalized for mental impairment or declared disabled because of a mental condition).

Looking to the record, substantial evidence supports the ALJ's RFC determination.

**Hypothetical Question**

The Commissioner can rely on the testimony of a VE to satisfy his burden of showing that the claimant can perform other work. <u>Robson v. Astrue</u>, 526 F.3d 389, 392 (8th Cir. 2008). For the VE's testimony to rise to substantial evidence, the ALJ's hypothetical question must be correctly phrased and must capture the concrete consequences of the claimant's deficiencies. <u>Id.</u> The ALJ's hypothetical question does not have to include all of the claimant's alleged impairments; it need include "only those impairments that the ALJ finds are substantially supported by the record as a whole." <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 889 (8th Cir. 2006).

During the first hearing, the ALJ had the VE assume that Clewis had the RFC to perform simple, routine, and repetitive tasks on a sustained basis, but needed to avoid interaction with co-workers or the general public. (Tr. 437-38.) This hypothetical corresponded to the ALJ's ultimate RFC determination, which was supported by substantial medical evidence. (Tr. 16.) Looking to <u>Lacroix</u> and <u>Robson</u>, the Commissioner satisfied his burden of showing that the claimant can perform other work in the national economy.

## VI.   RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have until February 15, 2010 to file documentary objections to this Report and Recommendation. The failure to file timely documentary objections may waive the right to appeal issues of fact.

/S/　 David D. Noce
　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**

Signed on February 1, 2010.